0IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| PATRICK DUNN, | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 15-00258-KD-N |
| | ) | |
| PHOENIX WEST II, LLC, | ) | |
| PHOENIX WEST II OWNERS | ) | |
| ASSOCIATION, INC., and | ) | |
| BRETT/ROBINSON GULF | ) | |
| CORPORATION, | ) | |
|     Defendants. | ) | |

## REPORT AND RECOMMENDATION

This action is before the Court on the three Motions to Dismiss the First Amended Complaint (Docs. 38, 40, 43) and supporting briefs (Docs. 39, 41, 44) filed by Defendants Phoenix West II, LLC ("PW II"), Phoenix West II Owners Association, Inc. (hereinafter, "the Association"), and Brett/Robinson Gulf Corporation ("Brett/Robinson"). Plaintiff Patrick Dunn has timely filed responses in opposition (Docs. 47, 48, 52) to the motions,[1] and the Defendants have timely filed replies (Docs. 49, 50, 54) to the responses, with PW II and Brett/Robinson also filing a separate Notice of Adoption of various arguments made by the Association (Doc. 46). The motions are now under submission (*see* Docs. 42, 45) and are ripe for disposition.

Under S.D. Ala. GenLR 72(b), these motions have been referred to the undersigned Magistrate Judge for entry of a report and recommendation as to the

---

[1] Plaintiff Amanda Northrup also opposed the motions to dismiss but has since voluntarily dismissed her claims against all Defendants without prejudice under Federal Rule of Civil Procedure 41(a)(1)(A)(i). (*See* Doc. 56 [Notice of Dismissal]). Thus, the undersigned does not address the motions as they relate to Northrup's claims.

appropriate disposition, in accordance with 28 U.S.C. § 636(b)(1)(B)-(C), Federal Rule of Civil Procedure 72(b)(1), and S.D. Ala. GenLR 72(a)(2)(S).   Upon consideration, and for the reasons stated herein, the undersigned **RECOMMENDS** that the Motions to Dismiss (Docs. 38, 40, 43) be **GRANTED in part** and **DENIED in part**, as set out.

## I.   Applicable Legal Standards

The Defendants have moved for dismissal of the First Amended Complaint (Doc. 33) both under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted and under Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction.   In deciding a Rule 12(b)(6) motion to dismiss "failure to state a claim upon which relief can be granted," the Court construes the complaint in the light most favorable to the plaintiff, "accepting all well-pleaded facts that are alleged therein to be true."   *Miyahira v. Vitacost.com, Inc.*, 715 F.3d 1257, 1265 (11th Cir. 2013) (citing *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1328 (11th Cir. 2006)).   However, " 'the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.' "   *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).

> To withstand Rule 12(b)(6) scrutiny and satisfy Rule 8(a), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," so as to "nudge[ ][its] claims across the line from conceivable to plausible." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U .S. 662, 678, 129 S. Ct. 1937, 173 L.

> Ed. 2d 868 (2009) (citation omitted). "This necessarily requires that a plaintiff include factual allegations for each essential element of his or her claim." *GeorgiaCarry.Org, Inc. v. Georgia,* 687 F.3d 1244, 1254 (11th Cir. 2012). Thus, minimum pleading standards "require [ ] more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555. As the Eleventh Circuit has explained, *Twombly/Iqbal* principles require that a complaint's allegations be "enough to raise a right to relief above the speculative level." *Speaker v. U.S. Dep't of Health and Human Services Centers for Disease Control and Prevention,* 623 F.3d 1371, 1380 (11th Cir. 2010) (citations omitted). "To survive a 12(b)(6) motion to dismiss, the complaint does not need detailed factual allegations, ... but must give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Randall v. Scott,* 610 F.3d 701, 705 (11th Cir. 2010) (citations and internal quotation marks omitted).

*Cochran v. Southern Co.*, Civil Action No. 14-0569-WS-N, 2015 WL 3508018, at *1 (S.D. Ala. June 3, 2015). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citation and quotations omitted). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss. Determining whether a complaint states a plausible claim for relief [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]' — 'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (citations omitted). "Importantly, … courts may infer from the factual allegations in the complaint 'obvious alternative

explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Am. Dental Ass'n*, 605 F.3d at 1290 (quoting *Iqbal*, 556 U.S. at 682).

Generally, when deciding a Rule 12(b)(6), the district court is limited to the four corners of the complaint. *Speaker*, 623 F.3d at 1379.

> If matters outside the pleadings are presented by the parties … , the Rule 12(b)(6) motion must be converted into a Rule 56 summary judgment motion. Fed. R. Civ. P. 12(d). Th[e Eleventh Circuit Court of Appeals], however, has recognized an important qualification to this rule where certain documents and their contents are undisputed: "In ruling upon a motion to dismiss, the district court may consider an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *SFM Holdings, Ltd. v. Banc of Am. Secs., LLC,* 600 F.3d 1334, 1337 (11th Cir. 2010); *see also Harris v. Ivax Corp.,* 182 F.3d 799, 802 n.2 (11th Cir. 1999) (stating that "a document central to the complaint that the defense appends to its motion to dismiss is also properly considered, provided that its contents are not in dispute").

*Id.*   Here, all parties have relied on extrinsic documents in arguing the present Rule 12(b)(6).   No party has challenged these extrinsic documents as improper or as requiring conversion of the motions to dismiss into summary judgment motions, and the undersigned finds they can considered without conversion.   Thus, the undersigned will consider the various extrinsic documents to the extent they are relevant to arguments raised.

Finally, the Court looks to the pleading as a whole in determining whether the "plausibility standard" has been satisfied.   *See Speaker*, 623 F.3d at 1382 ("Reading Speaker's Amended Complaint as a whole, we conclude that it both alleges the requisite statutory elements and marshals 'enough facts to state a claim to relief

that is plausible on its face.'   *Twombly*, 550 U.S. at 570, 127 S. Ct. at 1974.");
*Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1252 n.11 (11th Cir.
2005) (per curiam) (stating that, in a Rule 12(b)(6) context, "[w]e read the complaint
as a whole").

The Defendants have also challenged the Court's subject-matter jurisdiction
over this action under Rule 12(b)(1) by arguing that Dunn has not demonstrated
standing to bring the present causes of action.   "[I]n a motion to dismiss, [courts]
usually 'evaluate standing based on the facts alleged in the complaint.' "   *Houston v.
Marod Supermarkets, Inc.*, 733 F.3d 1323, 1335 (11th Cir. 2013) (quoting *Shotz v.
Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001)).   As no party has submitted extrinsic
evidence in addressing the issue of standing, the Defendants' challenge is a facial
attack on subject-matter jurisdiction, and the undersigned has thus only considered
the allegations in the First Amended Complaint (Doc. 33) in addressing that issue.
*See Houston*, 733 F.3d at 1335-36 ("Facial attacks to subject matter jurisdiction
require the court merely to look and see if the plaintiff's complaint has sufficiently
alleged a basis of subject matter jurisdiction, and the allegations in his complaint are
taken as true for the purposes of the motion." (citing *Carmichael v. Kellogg, Brown &
Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009)).

## II.   <u>Causes of Action</u>

Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et
seq.* (hereinafter, "Title III"), concerning "Public Accommodations and Services
Operated by Private Entities," generally provides that "[n]o individual shall be

discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Dunn's First Amended Complaint (Doc. 33) asserts six counts against the Defendants, alleging various violations of Title III:

**Count 1** (against all Defendants) – Unlawful discrimination under § 12182(a) for "failure to remove architectural barriers … in existing facilities, where such removal is readily achievable[,]" 42 U.S.C. § 12182(b)(2)(A)(iv) or, "where an entity can demonstrate that the removal of a barrier under [§ 12182(b)(2)(A)(iv)] is not readily achievable, a failure to make such goods, services, facilities, privileges, advantages, or accommodations available through alternative methods if such methods are readily achievable." *Id.* § 12182(b)(2)(A)(v).

**Count 2** (against all Defendants) – Unlawful discrimination under § 12182(a) for "failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services…" 42 U.S.C. § 12182(b)(2)(A)(iii).

**Count 3** (against all Defendants) – Unlawful denial of the opportunity to participate, in violation of 42 U.S.C. § 12182(b)(1)(C) ("Notwithstanding the existence of separate or different programs or activities provided in

accordance with this section, an individual with a disability shall not be denied the opportunity to participate in such programs or activities that are not separate or different.") – specifically, "the opportunity to participate equally in the rental program for the condominiums at Phoenix West II condominiums at Phoenix West II because Defendants do not maintain any accessible condominiums and/or facilities at Phoenix West II[,]" and "the opportunity to participate at each and every program and activity at Phoenix West II, because the defendants do not maintain any accessible condominiums and/or facilities at Phoenix West II."   (Doc. 33 at 25, ¶¶ 56 – 57).

**Count 4** (against all Defendants) - Unlawful discrimination under § 12182(a) for "the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations…"   42 U.S.C. § 12182(b)(2)(A)(i) – specifically, "Defendants utilize the reservation system to screen out disabled individuals, so that they do not come to Phoenix West II. The screening out process specifically involves directing disabled individuals away from Phoenix West II to a hotel alleged by the reservation system to be ADA compliant, but that in reality is not ADA compliant." (Doc. 33 at 27, ¶ 66).

**Count 5** (against all Defendants) - Unlawful discrimination under § 12182(a) for "failing to ensure that individuals with disabilities can make reservations for accessible guest rooms during the same hours and in the same manner as

nondisabled individuals, pursuant 28 C.F.R. § 36.302(e)(1)(i), and by failing to describe the accessible features in the hotel and guest rooms offered through its reservations' service both in advertisements and online in enough detail to reasonably permit individuals with disabilities to assess independently whether the condominium meets their accessibility needs, pursuant to 28 C.F.R. § 36.302(e)(1)(ii)."[2]   (Doc. 33 at 28, ¶ 77) – specifically, "Dunn could not determine from the existing systems and advertisements whether his condominium was accessible."   (*Id.* at 28 – 29, ¶ 78).

**Count 6** (against PW II only) - Unlawful discrimination under § 12182(a) for "failure to design and construct facilities for first occupancy later than 30 months after July 26, 1990, that are readily accessible to and usable by individuals with disabilities…"   42 U.S.C. § 12183(a)(1).

### III.   Well-Pleaded Factual Allegations[3]

Dunn resides in Andalusia, Alabama.   As the result of an automobile

---

[2]

A public accommodation that owns, leases (or leases to), or operates a place of lodging shall, with respect to reservations made by any means, including by telephone, in-person, or through a third party—
(i) Modify its policies, practices, or procedures to ensure that individuals with disabilities can make reservations for accessible guest rooms during the same hours and in the same manner as individuals who do not need accessible rooms;

(ii) Identify and describe accessible features in the hotels and guest rooms offered through its reservations service in enough detail to reasonably permit individuals with disabilities to assess independently whether a given hotel or guest room meets his or her accessibility needs…

28 C.F.R. § 36.302(e)(1).

[3] Taken from Dunn's First Amended Complaint (Doc. 33), as timely amended (Doc. 61).

accident in 2001, Dunn is paralyzed, is permanently confined to a wheelchair, and is restricted in his ability to use his hands, arms, and legs.   Dunn and his family planned a vacation at the Phoenix West II condominium complex in Orange Beach, Alabama (hereinafter, "the Complex"), in April 2015.   In March 2015, Dunn called the Complex to inquire about accessible rooms.

Dunn spoke with an employee of Brett/Robinson, who informed Dunn that the Complex did not provide ADA-accessible rooms and that the only ADA accessible rooms Brett/Robinson offers are located at another facility, the Phoenix All Suites Hotel.   Further inquiring about the accessibility at the hotel and the size of the rooms, Dunn was informed by the Brett/Robinson employee that the rooms available had bunk beds in the hall.   Upon this information, Dunn went online to determine if the hotel would meet his accessibility needs but was unable to because Brett/Robinson did not sufficiently identify and describe the accessible features on the website.   As a result, Dunn went to the Complex's website to determine if it had any accessible features at all and to assess whether the Complex would be large enough for him to make do, since he was already informed the condominium units were not accessible. His review of the Complex's website was inconclusive because the website lacked sufficient information.

Ultimately, Dunn decided to go to the Complex, made reservations, and went there with his family and friends. During Mr. Dunn's visit he went from the parking lot to the entranceways, from the parking lot to and throughout the Complex, including his rented condominium, the services areas, bathrooms, pool area, the

pier, paths of travel, common areas, recreational areas, the fitness center, and the men's sauna.   The kitchen, bedroom, bathroom, balcony, and seating area in Dunn's rented condominium were not accessible to him, and Dunn encountered architectural barriers to accessibility in other areas of the Complex that he visited.

"Mr. Dunn not only intends to return to [the Complex] in the future, but also has concrete and realistic plans to do exactly that.  Generally, Mr. Dunn visits Orange Beach frequently because of its proximity to his home. Specifically, Mr. Dunn will definitely return in Spring 2016 for a similar vacation as his 2015 visit … It is a virtual certainty that he will return again in Spring 2017 for a similar vacation visit. Moreover, Mr. Dunn will absolutely continue to return at least once a year as necessary to verify that [the Complex] is ADA-compliant to his satisfaction." (Doc. 61).

## IV.   <u>Analysis</u>

### A.   *Standing*

The Association, joined by the other Defendants (*see* Doc. 46), argues that the First Amended Complaint is due to be dismissed under Rule 12(b)(1) because its allegations are insufficient to demonstrate Dunn's standing to bring this action. "Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims. In the absence of standing, a court is not free to opine in an advisory capacity about the merits of a plaintiff's claims. In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues …   Standing is a

doctrine that stems directly from Article III's 'case or controversy' requirement, and thus it implicates [federal courts'] subject matter jurisdiction … [A]s with any jurisdictional requisite, [federal courts] are powerless to hear a case when it is lacking." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 974 (11th Cir. 2005) (citations and quotations omitted).   Thus, the undersigned addresses the issue of standing first.

A plaintiff "must satisfy three requirements to have standing under Article III of the Constitution: (1) 'injury-in-fact'; (2) 'a causal connection between the asserted injury-in-fact and the challenged action of the defendant'; and (3) 'that the injury will be redressed by a favorable decision.' " *Houston*, 733 F.3d at 1328 (quoting *Shotz,* 256 F.3d at 1081 (internal quotation marks omitted) (citing *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992))).

> The "injury-in-fact" demanded by Article III requires an additional showing when injunctive relief is sought. In addition to past injury, a plaintiff seeking injunctive relief "must show a sufficient likelihood that he will be affected by the allegedly unlawful conduct in the future." *Wooden v. Bd. of Regents of Univ. Sys. of Ga.,* 247 F.3d 1262, 1284 (11th Cir. 2001). Because injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party shows "a real and immediate—as opposed to a merely conjectural or hypothetical—threat of *future* injury." *Shotz,* 256 F.3d at 1081; *Wooden,* 247 F.3d at 1284 (citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 102, 103 S. Ct. 1660, 1665, 75 L. Ed. 2d 675 (1983)).

*Id.* at 1328-29.

All of Dunn's claims in his First Amended Complaint (Doc. 33) are asserted under Title III, for which "injunctive relief … is the only form of relief available…" *Houston*, 733 F.3d at 1329.   To demonstrate a real and immediate threat of future

injury, "a plaintiff seeking an injunction under Title III either must 'have attempted to return' to the non-compliant building or at least 'intend to do so in the future.'" *Id.* at 1336 (quoting *Shotz,* 256 F.3d at 1081). Here, Dunn has alleged only a single visit to the Complex; none of his allegations suggest he has attempted to return to the Complex. Initially, Dunn's First Amended Complaint alleged that he "wants to return to [the Complex] and … will definitely do so when the architectural barriers are properly remediated." (Doc. 33 at 12, ¶ 14). Citing this allegation, the Defendants argue "[i]t is not plausible for [Dunn] to allege a significant likelihood that [he] will visit Phoenix West II in the future and sustain any alleged injury given [his] own amended pleadings which expressly state that [his] plans to visit Phoenix West II in the future are contingent upon the alterations and modifications [he] demand[s] in order to make the entire facility fully accessible to them. As such, based on [his] own Amended Complaint, [Dunn] lack[s] standing to bring this action…" (Doc. 44 at 10).[4]

In *Houston*, the district court had dismissed the plaintiff's Title III claims under Rule 12(b)(1) for lack of standing. The Eleventh Circuit vacated and remanded, holding, *inter alia*, that the plaintiff had sufficiently shown a real and immediate threat of future injury. In so holding, the court first examined *Shotz* and *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237 (11th Cir. 2000) (per curiam), two previous decisions in which it had "addressed the requirement of a real and immediate threat of future injury in … ADA cases[,]" noting as follows:

---

[4] Defendant Owners Association raised this argument in its initial brief in support of its motion to dismiss; the other two Defendants subsequently adopted it. (*See* Doc. 46).

In *Shotz,* this Court held that the plaintiffs lacked standing to pursue their disability discrimination claims under § 12132 of the ADA's Title II. 256 F.3d at 1082. The *Shotz* plaintiffs alleged that they had encountered architectural barriers when they visited a Levy County, Florida courthouse in July of 1999. *Id.* at 1078–79. The plaintiffs sought "injunctive relief compelling [Levy] County to comply with the ADA." *Id.* at 1079.

The district court in *Shotz* dismissed the plaintiffs' complaint because, inter alia, plaintiffs had failed to sufficiently allege their standing to pursue injunctive relief. On appeal, this Court explained that "a plaintiff lacks standing to seek injunctive relief unless he alleges facts giving rise to an inference that he will suffer *future* discrimination ] by the defendant." *Id.* at 1081 (emphasis added). We concluded that the *Shotz* plaintiffs failed to "allege a real and immediate threat of future discrimination" because their "complaint contain[ed] only past incidents of discrimination." *Id.* at 1082. We observed that "since their July 1999 visit to the Levy County Courthouse, the plaintiffs have not attempted to return, nor have they alleged that they intend to do so in the future." *Id.* We explained that "[a]bsent such an allegation, the likelihood of future discrimination remains conjectural, hypothetical, or contingent, and not real and immediate." *Id.* (internal quotation marks omitted) We, therefore, concluded that the *Shotz* plaintiffs lacked Article III standing to sue for injunctive relief. *Id.*

In contrast, in *Stevens,* this Court concluded that the plaintiff had standing to seek an injunction under ADA's Title III. 215 F.3d at 1239. The *Stevens* plaintiff took a trip aboard defendant's cruise ship and allegedly discovered multiple ADA violations, including a lack of wheelchair accessible cabins and paths to public areas. *Id.* at 1238–39.

The district court in *Stevens* dismissed the plaintiff's complaint on two grounds. *Id.* First, because the plaintiff sought only injunctive relief but did not allege a threat of future injury, the district court concluded that the "[p]laintiff had not pleaded properly her standing to pursue the ADA claim." *Id.* Second, the district court concluded that the ADA did not apply to the defendant's foreign-flag cruise ship as a matter of law. *Id.* The plaintiff moved for reconsideration and sought leave to amend her complaint so that she could "cure the failure to plead standing to pursue injunctive relief." *Id.* The plaintiff attached a proposed amended

complaint to her motion in which she alleged that "in the near future, she would take another cruise aboard Defendant's ship." *Id.* The district court denied leave to amend, reasoning that the amendment would be futile given the inapplicability of the ADA to the defendant's foreign-flag ship. *Id.*

On appeal, this Court concluded that the defendant's foreign-flag ship was covered by Title III of the ADA. *Id.* at 1242–43. Amending the complaint to cure the standing deficiency was, therefore, not a futile exercise. This Court thus reversed the district court's denial of leave to amend. *Id.* We noted that a plaintiff pursuing "injunctive relief in federal court must plead a genuine threat of imminent injury." *Id.* This Court was "satisfied" that the *Stevens* plaintiff's allegation that she would take another cruise aboard defendant's ship "in the near future" was sufficient to properly allege standing for injunctive relief under Title III of the ADA. *Id.*

*Houston*, 733 F.3d at 1334-35.

Applying the reasoning in *Schotz* and *Stevens*, the *Houston* court held that the plaintiff had sufficiently alleged a real and immediate threat of future injury, writing:

Plaintiff Houston had two undisputed past encounters of the alleged architectural barriers in the Presidente Supermarket. While "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy," *Lyons,* 461 U.S. at 103, 103 S. Ct. at 1666, the plaintiff's exposure to illegal conduct in the past is nonetheless "evidence bearing on whether there is a real and immediate threat of repeated injury," *O'Shea v. Littleton,* 414 U.S. 488, 496, 94 S. Ct. 669, 676, 38 L. Ed. 2d 674 (1974)…

Plaintiff Houston has visited this particular supermarket twice and encountered the alleged architectural barriers during each visit. He submitted a receipt from the second visit. We therefore note that Houston did, in fact, return to the Presidente Supermarket before filing this lawsuit, even after he had faced the alleged barriers during his first visit.

Turning to the 30.5 mile distance between Plaintiff Houston's residence and the Presidente Supermarket, we understand that this particular store is not the closest supermarket to Houston's home. But Houston explained his reason to go to this store: he travels to Miami–Dade County, where the Presidente Supermarket is located, "on a regular basis," and Houston expects to be there in the future. Houston takes these trips to Miami–Dade County because his lawyer's offices are located there—less than two miles from the Presidente Supermarket. And because of his many ADA lawsuits, Plaintiff Houston "definitely" anticipates going to his lawyer's offices "in the near future." Houston passes the Presidente Supermarket on his way to and from his lawyer's office. According to his affidavit, Houston therefore "would return to the Defendant's store to shop if [he] were able to park in the parking spaces, have accessible restrooms, and be able to avail [him]self of the store's other facilities."

Under these particular, undisputed facts, we cannot say that a distance of 30.5 miles makes the threat of future injury conjectural. Of course, different facts may demand a different conclusion. Plaintiff Houston lives in the next county. He does not live hundreds of miles away from the store with no particular reason to return.

In light of the totality of the undisputed facts here, we conclude that Plaintiff Houston has standing to seek injunctive relief for violations of 42 U.S.C. §§ 12182(a) and 12182(b)(2)(A)(iv) of the ADA's Title III. *See Shotz,* 256 F.3d at 1081. There is no indication in the record that the alleged architectural barriers in the Presidente Supermarket have been remedied. As a result, there is a 100 percent likelihood that Plaintiff Houston will suffer the alleged injury again when he returns to the store. *Cf. 31 Foster Children v. Bush,* 329 F.3d 1255, 1266 (11th Cir. 2003) (holding that "when the threatened acts that will cause injury are authorized or part of a policy, it is significantly more likely that the injury will occur again").

The likelihood of Houston suffering future injury thus is not contingent upon events that are speculative or beyond his control. Cf. *Lyons,* 461 U.S. at 107–09, 103 S. Ct. at 1668–69 (holding that the plaintiff lacked standing for injunctive relief because it was speculative that police officers would arrest him again and that those police officers would then apply an allegedly unconstitutional chokehold again).  Rather,

the cause of the injury continues to exist, and the likelihood of Houston encountering that cause in the future depends only on Houston's own volition. Houston has been to the store in the past, he wants to return, and his frequent trips directly past the store render it likely that he would do so were it not for the alleged ADA violations in the Presidente Supermarket. Under the totality of the facts here, the threat of future injury to Houston is not merely "conjectural" or "hypothetical." Instead, it is "real and immediate." *See Church v. City of Huntsville,* 30 F.3d 1332, 1337–39 (11th Cir. 1994) (finding standing for homeless plaintiffs to seek injunctive relief to stop certain police practices).

*Id.* at 1336-37.

The Eleventh Circuit's analysis did not end there, however.   The defendant also argued "that recognizing Houston's standing conflicts with the Supreme Court's decision in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992)."   *Id.* at 1337.   In relevant part, *Lujan* held that, when a plaintiff seeking injunctive relief expresses only "a generalized wish to return [to a place] 'in the future,' … 'such "some day" intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the "actual or imminent" injury that' " is required for injunctive relief. *Id.* at 1338 (quoting *Lujan,* 504 U.S. at 564).

The *Houston* court rejected this argument.   Noting that "[i]mmediacy is an 'elastic concept,' *Lujan*, 504 U.S. at 564 n.2, 112 S. Ct. at 2138 n.2, and in this context 'means reasonably fixed and specific in time and not too far off,' " *id.* at 1340 (quoting *ACLU of Fla., Inc. v. Miami–Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1193-94 (11th Cir. 2009)), the court held:

Plaintiff Houston has traveled to Miami–Dade County on a regular basis in the past and expects to do so in the near future. Indeed, he

16

drives right by the store on a regular basis, he entered the store on two prior occasions, and he would do so again if the store were ADA compliant. That is enough; … Houston has frequently visited the area near the store in the past and will maintain the same frequency in the future.

…

[Additionally], Houston has offered the "description of concrete plans" that the Supreme Court found missing in *Lujan:* Plaintiff Houston visits his lawyer's offices near the Presidente Supermarket on a frequent basis and, thus, drives by the store frequently. During these trips to his lawyer's office in the near future, he wants to visit the store. Unlike the plaintiffs in *Lujan,* Houston has averred a concrete and realistic plan of when he would visit the store again.

In sum, we conclude that **<u>under the specific facts in the record before us</u>**, Plaintiff Houston has standing to seek injunctive relief against Defendant Marod.

*Id.* (emphasis added).   As *Houston* noted, "determining standing for injunctive relief is often a fact-sensitive inquiry … Each plaintiff must establish standing on the facts of the case before the court."   *Id.*

Previously, the undersigned determined that Dunn had failed to sufficiently allege standing under Title III but granted him leave to amend his First Amended Complaint to do so.   (*See* Doc. 60).   Dunn has timely filed his amendment (Doc. 61), which alleges that he "intends to return to [the Complex] in the future," Mr. "visits Orange Beach frequently because of its proximity to his home[,]" "will definitely return in Spring 2016 for a similar vacation as his 2015 visit, [and] will return again in Spring 2017 for a similar vacation visit.   Moreover, Mr. Dunn will absolutely continue to return at least once a year as necessary to verify that [the Complex] is ADA-compliant to his satisfaction."   Having alleged a "concrete and

realistic plan" to return to the Complex in its alleged non-compliant form, Dunn has sufficiently shown a real and immediate threat of future injury on his return. Thus, the undersigned finds that Dunn has sufficiently alleged standing to bring his claims under Title III.   *See Houston*, 733 F.3d at 1340 ("[A] plaintiff seeking an injunction under Title III either must have attempted to return to the **non-compliant** building or at least intend to do so in the future." (quotation marks omitted)); *id.* at 1340 (evidence that the plaintiff frequently visited the vicinity of the non-compliant supermarket, had shopped there before, and expressed a desire to shop there again demonstrated "a concrete and realistic plan" to return); *id.* ("This Court held that the plaintiffs in [*National Parks Conservation Ass'n v.* ]*Norton*[, 324 F.3d 1229 (11th Cir. 2003),] satisfied *Lujan*'s immediacy requirement because they had visited the Biscayne Bay Park frequently in the past and intended to do so in the future.   324 F.3d at 1243."); *Seco v. NCL (Bahamas), Ltd.*, 588 F. App'x 863, 865-66 (11th Cir. Oct. 2, 2014) (per curiam) (unpublished) ("NCL insists that Seco's allegation that he '**has future cruises planned** on NCL' fails to establish the requisite 'likelihood that [Seco] will be affected by the allegedly unlawful conduct in the future.' [*Houston*, 733 F.3d] at 1328 (internal quotation marks omitted).   This argument is foreclosed by our decision in *Stevens v. Premier Cruises, Inc.,* in which we were 'satisfied' that the plaintiff's allegation that she 'would take another cruise aboard' the defendant's ship '**in the near future**' was sufficient to demonstrate standing for injunctive relief under Title III. 215 F.3d 1237, 1239 (11th Cir. 2000)." (emphasis added)); *Cohan v. Bonita Resort & Club Ass'n, Inc.*, No.

2:15-CV-61-FTM-38DNF, 2015 WL 2093565, at *5 (M.D. Fla. May 5, 2015) ("In the Complaint, Plaintiff lists the exact date that he visited Defendants' property. He then describes the various barriers that he encountered on Defendants' property that violate the ADA. Next, he announces how he '**intends** to return and enjoy the goods and/or services at [Defendants' Property],' but 'is precluded from doing so' because of the existing barrier violations. And finally, he alleges that '[t]o date, the readily achievable barriers and violations of the ADA still exist and have not been remedied or altered in such a way as to effectuate compliance with the provisions of the ADA.' In other words, Plaintiff has already faced discrimination at Defendants' Property based on his disability; to his knowledge, Defendants have not corrected the discriminating barriers; and, because he **intends** to return to Defendants' Property, Plaintiff will continue to face discrimination based on his disability. In the Court's view, this is a sufficient allegation of future injury." (emphasis added) (record citations omitted)); *Cohan v. Naples Hotel Co.*, No. 2:14-CV-450-FTM-38CM, 2014 WL 5782795, at *5 (M.D. Fla. Nov. 6, 2014) ("In the Complaint, Plaintiff alleges that he 'would like to return and enjoy the goods and/or services at [Defendants' Property] on a spontaneous, full and equal basis'; that he 'is precluded from doing so by [ ] Defendant[s'] failure and refusal to provide disabled persons with full and equal access to their facilities'; that he '**intends to visit [Defendants' Property] annually to verify compliance**'; and that he believes 'said violations will not be corrected without court intervention.' ... [W]hen Plaintiff's allegations are taken as for the purposes of this Motion, Plaintiff has sufficiently established a genuine

threat of imminent and future injury that satisfies the 'injury-in-fact' standing requirement." (emphasis added) (record citation omitted)).

Accordingly, the undersigned **RECOMMENDS** that the Defendants' motions to dismiss under Rule 12(b)(1) for lack of standing be **DENIED**.   The undersigned will now address the Defendants' various arguments for dismissal under Rule 12(b)(6).

### B.    Is the Complex a "Place of Public Accommodation?"

The Association, joined by the other Defendants (*see* Doc. 46), has argued that the Complex is "designed for use as, and restricted to use as, private residences and, as such, is not 'a place of public accommodation' " subject to Title III.   (Doc. 44 at 15).   In support of this assertion, the Association cites to portions of a Declaration of Condominium (Doc. 44-1) for the Complex, made August 24, 2013, by PW II as the Complex "developer," providing that (1) "[e]ach owner shall be entitled to exclusive ownership and possession of his unit" (Doc. 44-1 at 16, § 9.01); (2) "[r]esidential units in the property shall be used only as a family residence by the Unit Owner, or his tenants" (*id.* at 29, § 15.01); and (3) "[t]he Common Elements[ of the Complex] shall be used only by the Unit Owners and their agents, servants, tenants, family members, invitees and licensees..." (*id.* at 75, ¶ 32).   According to the Association, these provisions demonstrate that the Complex "is not permitted to function as a motel, hotel, inn or lodge."   (Doc. 44 at 16).

For purposes of Title III, "an inn, hotel, motel, or **other place of lodging**" is considered a "public accommodation."   42 U.S.C. § 12181(7)(A).

"[C]ondominium buildings may be covered as places of public accommodation if they operate as places of lodging. Determining whether a particular condominium facility is a place of public accommodation would depend on the extent to which it shares characteristics normally associated with a hotel, motel or inn." Department of Justice Public Letter 202–PL–216 (Aug. 28, 1992); *see also Regents of Mercersburg College v. Republic Franklin Ins. Co.,* 458 F.3d 159, 165 (3d Cir. 2006) (finding that private-school dormitories are places of "public accommodation" under the ADA because they are more similar to "transient lodging" like "inns, hotels, and motels—which are covered" by the ADA, and less like "residential units such as apartments and condominiums—which are not covered by the ADA ..."); *Access 4 All, Inc. v. Atlantic Hotel Condominium Ass'n, Inc.,* 2005 WL 5643878, \*13 (S.D. Fla. Nov. 23, 2005) (finding that the hotel and condominium structure "was designed and intended for use as a public accommodation because individual unit owners who purchased a unit were likely to rent out the unit for public use," and was "virtually indistinguishable from a hotel.")

*Kromenhoek v. Cowpet Bay W. Condo. Ass'n,* 77 F. Supp. 3d 462, 479-80 (D.V.I. 2014).   *See also Cohan v. Ocean Club at Deerfield Beach Condo. Ass'n, Inc.,* No. 14-60196-CIV, 2014 WL 1274128, at \*2 (S.D. Fla. Mar. 27, 2014) ("A private condominium building may be classified as a place of public accommodation if it is used for short-term rentals of the variety normally associated with hotels or inns."); 28 C.F.R. § 36.207 ("When a place of public accommodation is located in a private residence, the portion of the residence used exclusively as a residence is not covered by this part, but that portion used exclusively in the operation of the place of public accommodation or that portion used both for the place of public accommodation and for residential purposes is covered by this part. []The portion of the residence covered ... extends to those elements used to enter the place of public accommodation, including the homeowner's front sidewalk, if any, the door or

entryway, and hallways; and those portions of the residence, interior or exterior, available to or used by customers or clients, including restrooms."); 1 *Ams. with Disabilities: Pract. & Compliance Manual* § 4:17 ("[I]f a hotel allows both residential and short-term stays, but does not allocate space for these different uses in separate, discrete units, both the ADA and the Fair Housing Act may apply to the facility, and such determinations are made on a case-by-case basis." (footnote omitted)); 28 C.F.R. Pt. 36, App. A, § 36.406(c) ("For many years the Department has received inquiries from members of the public seeking clarification of ADA coverage of rental accommodations in timeshares, condominium hotels, and mixed-use and corporate hotel facilities that operate as places of public accommodation (as that term is now defined in § 36.104). These facilities, which have attributes of both residential dwellings and transient lodging facilities, have become increasingly popular since the ADA's enactment in 1990 and make up the majority of new hotel construction in some vacation destinations. The hybrid residential and lodging characteristics of these new types of facilities, as well as their ownership characteristics, complicate determinations of ADA coverage, prompting questions from both industry and individuals with disabilities. While the Department has interpreted the ADA to encompass these hotel-like facilities when they are used to provide transient lodging, the regulation previously has specifically not addressed them. In the NPRM, the Department proposed a new § 36.406(c), entitled 'Places of Lodging,' which was intended to clarify that places of lodging, including certain timeshares, condominium hotels, and mixed-use and corporate

hotel facilities, shall comply with the provisions of the proposed standards, including, but not limited to, the requirements for transient lodging in sections 224 and 806 of the 2004 ADAAG.").

Here, Dunn's First Amended Complaint sets forth sufficient facts plausibly indicating that the Complex, or at least certain parts of it, is a "place of lodging" constituting a "place of public accommodation" subject to Title III.   *See* 28 C.F.R. § 36.104 (defining "place of lodging" as, *inter alia*, a "facility that— (A) Provides guest rooms for sleeping for stays that primarily are short-term in nature (generally 30 days or less) where the occupant does not have the right to return to a specific room or unit after the conclusion of his or her stay; and (B) Provides guest rooms under conditions and with amenities similar to a hotel, motel, or inn, including…(1) On- or off-site management and reservations service; (2) Rooms available on a walk-up or call-in basis; (3) Availability of housekeeping or linen service; and (4) Acceptance of reservations for a guest room type without guaranteeing a particular unit or room until check-in, and without a prior lease or security deposit.").   Specifically, Dunn has alleged that a condominium at the Complex was rented to him for a short-term stay, (less than 30 days); Upon Mr. Dunn's arrival at the condominium, he was required to check in at the front desk with an employee of Brett/Robinson; Mr. Dunn had the opportunity to have housekeeping services during his stay; Mr. Dunn did not have the right to return to his specific room after he checked-out of his condominium at the front desk; the services provided were similar to a hotel or motel in that there was onsite management and a reservation system, as well as

23

reservations are accepted without guaranteeing a particular unit until check –in and without a prior lease; and housekeeping or linen service was available."   (Doc. 33 at 5, ¶ 7).

"The [Defendants] ultimately may be able to prove that the [Complex] is a private condominium building outside the scope of the ADA. Nevertheless, whether the [Complex] is a place of public accommodation that shares characteristics with hotels or inns, and is accordingly subject to the ADA, raises a disputed factual issue inappropriate for resolution on a motion to dismiss."   *Cohan*, 2014 WL 1274128, at *2.[5]   Thus, the undersigned recommends that the Defendants' motions to dismiss

---

[5]   The Defendants rely heavily on *Thompson v. Sand Cliffs Owners Association, Inc.*, 1998 WL 35177067 (N.D. Fla. Mar. 30, 1998), in which the district court, on summary judgment, held that a condominium complex was not an "other place of lodging" for purposes of Title III, finding that the condominiums were "residential in nature despite the fact that they are occasionally rented for one week periods[, and that] the condominiums do not share sufficient similar characteristics with the other facilities listed in the statute to justify labeling them as other places of lodging."   *Thompson*, more than seventeen years old, relied on an older version of the ADA regulations interpreting "other place of lodging" that was not as specific as the current regulations.   Indeed, in its commentary to the September 2010 revision of the Title III regulations, the Department of Justice expressly noted that condominium hotels and other hotel-like facilities used for transient lodging were not specifically addressed in previous versions of the regulations, though even under those previous versions the DOJ had "interpreted the ADA to encompass these hotel-like facilities when they are used to provide transient lodging."   28 C.F.R. Pt. 36, App. A, § 36.406(c).   As such, *Thompson* is not persuasive.   The other court opinions the Defendants cite in support of this argument (*see* Doc. 44 at 19 – 20) simply stand for the unremarkable proposition that apartments and condominiums used solely for residential purposes are not "places of public accommodation" under Title III.

The Association, joined by the other two Defendants (*see* Doc. 46), also argues that the Complex is subject to the 1991 ADA Standards for Accessible Design, *see* 28 C.F.R. Pt. 36, App. D, rather than, as Dunn alleges, the 2010 ADA Standards for Accessible Design and that it is not considered a "place of public accommodation" under the 1991 standards. (*See* Doc. 44 at 14 – 15 ("The 1991 ADAAG standards do not contain the provisions upon which Plaintiffs rely in support of their position (which is incorrect even under the 2010 standards) that the condominium is a place of public accommodation.").   Whether the Complex is a "place of public accommodation" under the ADA and its regulations is a separate issue from what design standards apply to it.   Moreover, as was previously noted, even under previous version of the ADA regulations, the DOJ has "interpreted the ADA to

24

be **DENIED** to the extent they argue the Complex is not a place of public accommodation under Title III.

### C.   Do the Defendants Own, Lease (or Lease to), or Operate a Place of Public Accommodation?

Title III's prohibitions apply to "any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a). Dunn alleges that PW II "owns" the Complex, based on "information and belief from property records on the Baldwin County Geographical Information Systems database (GIS), as well as the Baldwin County Probate records…" (Doc. 33 at 3, ¶ 5). Dunn also alleges that PW II "operates" the Complex because it "is also the manager of Phoenix West II Owners Association Inc. [and] made ongoing covenants with the Phoenix West II Owners Association []as to the property." (*Id.*).

PW II claims the "allegation that [it] owns the [Complex] is false. In reality, the Association owns the [Complex] and improvements (excluding the individually owned condominiums); thus, the Association is the only entity that allegedly may exercise any control over the claimed" noncompliant features of the Complex. (Doc. 41 at 10). In support of this assertion, PW II cites to the aforementioned Declaration of Condominium (Doc. 44-1), as well as the Association's Articles of Incorporation filed with the Alabama Secretary of State (Doc. 12-1). PW II has moved for dismissal Counts 1, 2, 3, and 6 on the basis that it does not own, lease (or lease to), or operate the Complex.

---

encompass … hotel-like facilities[ such as condominium hotels] when they are used to provide transient lodging." 28 C.F.R. Pt. 36, App. A, § 36.406(c).

For purposes of a motion to dismiss under Rule 12(b)(6), the allegations in Dunn's complaint must be accepted as true.   Neither the Articles of Incorporation nor the Declaration of Condominium conclusively refute his allegation that PW II "owns" the Complex, or some portion thereof, for purposes of Title III.   Indeed, page one of the Declaration expressly states that PW II "is the fee simple owner of" the "real property" where the Complex is located "and improvements thereon," and the Declaration is characterized as "covenants to run with the land" which are "binding upon [PW II], it [sic] successors and assigns, and all subsequent owners of all or any part of said real property and improvements…"   (Doc. 44-1 at 6).   At most, the Declaration appears to suggest an issue of allocation of responsibility for ADA compliance that need not be addressed at this stage.[6]   *Cf.* 28 C.F.R. § 36.201(b) ("Both the landlord who owns the building that houses a place of public accommodation and the tenant who owns or operates the place of public accommodation are public accommodations subject to the requirements of this part. As between the parties, allocation of responsibility for complying with the obligations of this part may be determined by lease or other contract."); 1 *Ams. with Disabilities: Practice & Compliance Manual* § 4:44 ("A customer should not have to obtain a copy of the lease and other contracts in order to determine whether the landlord or the tenant is the proper defendant. The customer should be able to bring an action and let the tenant and the landlord fight among themselves over who is responsible to pay for any required improvements.   As a practical matter, it may be

---

[6] The Defendants have made no effort to enlighten the Court on how Alabama condominium law might define the relationship amongst them.

necessary to join both the landlord and the tenant in a private cause of action under Title III of the Americans with Disabilities Act of 1990 (ADA) in order to obtain effective relief." (footnotes omitted)); *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 379 (2d Cir. 2008) ("Of course, owners and operators of facilities may allocate by lease or contract their relative responsibilities for compliance with the ADA. *See Americans with Disabilities Act Handbook* at § 6.02[ (4th ed. 2003)]. And the Department of Justice has provided informal guidance suggesting that the duty to remove barriers depends on who has legal authority to make alterations, 'which is generally determined by the contractual agreement....' *Id.* (quoting U.S. Dep't of Justice, *Questions and Answers* (rev. Sept. 1992)) … Only if the district court finds that the named defendants, having exhausted all options, are unable to comply with its orders would it need to consider whether the plaintiffs had failed to identify and serve necessary and indispensable parties (such as individual proprietary tenants) under Fed. R. Civ. P. 19."); *Rush v. Sport Chalet, Inc.*, 779 F.3d 973, 974 (9th Cir. 2015) ("[A] landlord and tenant are jointly liable for ADA violations in the tenant's establishment regardless of any contractual provisions that shift liability. Either codefendant is free to seek indemnification from the other, but that does not affect an ADA plaintiff's right to recovery.").[7]

PW II cites a Florida federal district court opinion for the proposition that " '[t]o "operate" a place of public accommodation means to exercise control over the

---

[7] PW II, pointing out that Dunn alleges both it and the Association "own the condominiums," also claims "[i]t cannot be both…"   (Doc. 41 at 10 n.7).  Co-ownership of property is not unheard of; regardless, at this stage Dunn is permitted to plead alternative legal theories.

alleged discriminatory action and to have the authority to take remedial measures.' " (Doc. 41 at 9 (quoting *Steelman v. Florida*, No. 6:13-CV-123-ORL-36, 2013 WL 1104746, at *2 (M.D. Fla. Feb. 19, 2013) (citing *Neff v. Am. Dairy Queen Corp.*, 58 F.3d 1063, 1067 (5th Cir. 1996)), *report and recommendation adopted*, No. 6:13-CV-123-ORL-36, 2013 WL 1104256 (M.D. Fla. Mar. 18, 2013))). Thus, PW II argues, because the Association owns the Complex, "the Association is the only entity that allegedly may exercise any control over the claimed" noncompliant elements "and that has the authority to take remedial measures to address" them. (*Id.* at 10). PW II's argument attempts to conflate "owns" with "operates" under § 12182(a), while the express wording of the statute indicates two distinct concepts, either of which may subject an entity to Title III. *See* 42 U.S.C. § 12182(a) (applying Title III to "any person who **owns**, leases (or leases to), **or operates** a place of public accommodation" (emphasis added)). For purposes of the present motions to dismiss, the Court need not parse exactly how and to what extent PW II "owns" the Complex; rather, it is enough that Dunn has plausibly alleged PW II owns the Complex to some degree, and the documents submitted by PW II purporting to demonstrate otherwise do not render that allegation implausible.[8] Accordingly, the undersigned recommends that PW II's motion to dismiss be

---

[8] Because Dunn has plausibly alleged that PW II "owns" the Complex for purposes of § 12182(a), the undersigned need not, and does not, determine whether he has also plausibly alleged that PW II "operates" the Complex, as a showing of either is sufficient to apply § 12182(a). *See* Fed. R. Civ. P. 8(d)(2) ("A party may set out 2 or more statements of a claim…alternatively or hypothetically…If a party makes alternative statements, the pleading is sufficient if any of them is sufficient.").

**DENIED** to the extent PW II argues it does not "own" or "operate" a "public accommodation" for purposes of Title III.[9]

As for Brett/Robinson, Dunn alleges:

> Brett Robinson is the rental management entity for the individual property owners of the condominiums. In ADA terms, Brett Robinson "operates" the transient lodging rental program at the condominiums and "leases" or "leases to" the short term renters of the condominiums. 42 U.S.C. § 12182. Brett Robinson's responsibilities include promoting the property, finding customers for the rental program, and providing excellent service during the renters stay. Brett Robinson offers to the individual property owners of the condominiums a strategic marketing program; specialized reservations training; a website with interior and exterior photos and virtual tours; an owners website with a list of booking, work orders, and financial statements; annual property inspections and recommendations; provide the owners information and address service requests; maintenance service available 24 hours; commercial laundry and linen services; individual monthly accounting with direct deposit service available; storm recovery assistance; constant review of industry trends to remain competitive and maximize rentals; a 22% management fee; provide blankets, mattress pads, pillows, pillow protectors, potholders, shower linens, towels, and linen;

---

[9] The Association argues that Counts Two, Three, Four, and Five are due to be dismissed because Dunn does "not allege, and cannot plausibly allege or establish, that Owners operates a rental reservation system."  (Doc. 44 at 11 (Counts 4 & 5), 12 – 13 (Counts 2 & 3)).   Similarly, PW II argues for dismissal of Counts Four and Five because Dunn "fails to allege that [it] owns or controls the 'reservation system.' "  (Doc. 41 at 17, 19 – 20).   These arguments are red herrings.   The relevant "public accommodation" the Association and PW II allegedly "own" and/or "operate" is the Complex, with Counts Two through Five alleging that the rental reservation system utilized by the Complex "discriminate[s] against[ Dunn] on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of" the Complex in various ways.   42 U.S.C. § 12182(a).   Whether PW II and the Association "own" or "operate" the rental reservation system itself is irrelevant to these claims.   The Association has not argued that it does not "own" or "operate" the Complex for purposes of Title III, as Dunn alleges (*see* Doc. 33 at 7 – 8, ¶ 10), except to deny that it owns the individual condominium units.   As was previously noted with regard to PW II, and as noted again in Section IV(F), *infra*, for purposes of the present motions to dismiss it is enough for Dunn to plausibly allege that the Association "owns" or "operates" at least some aspects of the Complex.   The precise extent to which it can effect ADA compliance need not be addressed at this time.

limit the number of guests in the unit to the bedding and inspect properties between guests stays. Brett Robinson is the rental agency responsible for maintaining and providing opportunities for guests to make reservations to the Phoenix West II via the internet.

(Doc. 33 at 6 – 7, ¶ 9).   Dunn further alleges that, "[a]s pled in paragraph 9, in relation to the condominiums, Brett Robinson 'operates', 'leases', and 'leases [property] to' others, pursuant to 42 U.S.C. § 12182, such that it is responsible for the removal of architectural barriers."   (*Id.* at 14, ¶ 25; 23, ¶ 47; 25 – 26, ¶ 60; 27, ¶ 72; 29, ¶ 81).   Brett/Robinson disagrees and moves for dismissal of Counts 1 and 3 on the grounds that it does not own, lease (or leases to), or operate the Complex.

The undersigned disagrees that Brett/Robinson could be said to "lease" or "lease to" the Complex, as none of the allegations in the First Amended Complaint evidence a landlord/tenant relationship between Brett/Robinson and the Complex.[10] Instead, the allegations in the First Amended Complaint establish that Brett/Robinson is a third-party entity that runs the Complex's condominium rental program and provides various services to both individual condominium owners and guests in connection with the rental program.   As with the Association, the undersigned must therefore determine whether Dunn alleges sufficient facts to deem Brett/Robinson an "operator" of the Complex.[11]

---

[10] Contrary to Dunn's suggestion, "'leases property to others" is not a fair reading of § 12182(a)'s "lease to" provision.   As Brett/Robinson correctly points out (*see* Doc. 39 at 10), under a plain reading of the statute, a person must "lease to…a public accommodation" itself, no simply "others," in order to be subject to Title III.

[11] In a footnote in his response to Brett/Robinson's motion to dismiss, Dunn claims that on July 13, 2015, PW II deeded certain portions of the Complex to Brett/Robinson, thus making it an "owner" of the Complex.   (*See* Doc. 47 at 11 n.2).   The undersigned will not consider this assertion for purposes of the present motions.   Dunn has not attached any evidentiary

Noting that the ADA does not define the term 'operates,' the Fifth Circuit, construing the term with its ordinary and natural meaning, has held that "to 'operate,' in the context of a business operation, means 'to put or keep in operation,' '[t]o control or direct the functioning of,' '[t]o conduct the affairs of; manage' … [T]he relevant inquiry … is whether [a defendant] specifically controls the modification of the [public accommodation] to improve [its] accessibility to the disabled." *Neff*, 58 F.3d at 1066 (citations omitted). *Accord Colon v. League of United Latin Am. Citizens*, 91 F.3d 140 (5th Cir. 1996) (per curiam) (unpublished) (42 U.S.C. § 12182(a) "does not define the term 'operate'; but, in this context, our court applied its ordinary meaning-'to put or keep in operation', '[t]o control or direct the functioning of', or '[t]o conduct the affairs of; manage'. *Neff,* 58 F.3d at 1066. In accordance with our precedent, to be an 'operator' requires more than simply controlling some aspect of a public accommodation. Rather, the person must have control over the modification sought by the plaintiff. *Id.* at 1067. The modification at issue was exemption from the house rules, which forbid more than one player to play from a single package. To be an operator in this instance,

---

support for this contention, nor has he included such factual allegations in the First Amended Complaint (filed July 30, 2015, over two weeks after the deed was allegedly executed). Amendment of a pleading cannot be effected through representations in a brief in response to a motion to dismiss. *See SE Prop. Holdings, LLC v. Braswell*, Civil Action No. 13-0267-WS-N, 2013 WL 4498700, at *5 n.6 (S.D. Ala. Aug. 21, 2013) ("[I]n opposing the Motion to Dismiss and attempting to bolster its pleading, SEPH relies on unpleaded facts … The sufficiency of plaintiff's Complaint must be evaluated based on its contents, not those of a subsequent memorandum of law."); *Woodard v. Town of Oakman*, 885 F. Supp. 2d 1216, 1227 n.7 (N.D. Ala. 2012) ("Plaintiffs and Defendant Wilson reference numerous additional facts in their briefs that are not included in the complaint at issue … There is no law in this Circuit that a plaintiff may prevent dismissal for failure to state a claim by adding additional facts in his/her briefs, so long as they are 'consistent' with the complaint. The Court rejects all new factual assertions in both Plaintiffs' and Wilson's briefs.").

Rodriguez must have had the authority to allow Colon to play bingo with Trad's assistance, even though the rules prohibited this."); *Lentini v. Cal. Ctr. for the Arts, Escondido*, 370 F.3d 837, 849 (9th Cir. 2004) (adopting *Neff*'s definition of "to operate" under Title III); *Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002) (same).

In *Neff*, the Fifth Circuit Court of Appeals specifically addressed whether "a franchisor with limited control over a franchisee's store 'operates a place of public accommodation' " within the meaning of Title III. 58 F.3d at 1066. Examining pertinent language in the franchise agreement, the court answered in the negative, holding that, "while the terms of the … franchise agreement demonstrate that [the franchisor] retains the right to set standards for building and equipment maintenance and to 'veto' proposed structural changes, … this supervisory authority, without more, is insufficient to support a holding that [the franchisor] 'operates,' in the ordinary and natural meaning of that term, the [franchisee's] Store." *Id.* at 1068-69.

In reaching its determinations as to the scope of the term "operates," *Neff* noted:

> [T]wo district courts have interpreted "operates" in the context of hospital operations consistently with our approach to the question in the context of franchise store operations. In *Howe v. Hull*, 873 F. Supp. 72 (N.D. Ohio 1994), the court held that a physician "operated" a hospital because he exercised sole discretion over the allegedly discriminatory decision not to admit a patient with AIDS. The court specifically focused on the physician's authority over the allegedly discriminatory act. *Id.* at 77-78. In *Aikins v. St. Helena Hosp.*, 843 F. Supp. 1329 (N.D. Cal. 1994), the court held that a physician who

worked at a hospital as an independent contractor did not "operate" the hospital in question. The plaintiff in *Aikins*, the deaf wife of an emergency room patient, complained that the hospital had discriminated against her by failing to provide her with an interpreter. The court held that the physician defendant did not "operate" the hospital because, as an independent contractor, he exercised no authority over the hospital's policy on the use of interpreters. *Id.* at 1335.

*Id.* at 1066 n.9.   *See also Walker v. Carnival Cruise Lines*, 63 F. Supp. 2d 1083, 1091 (N.D. Cal. 1999) ("Insofar as plaintiffs would hold the Travel Agents liable for the condition of the [cruise ship], they have obviously failed to state a claim. The Travel Agents are bereft of control over Carnival's fleet—they do not own, lease or operate Carnival's ships—and therefore cannot be held responsible for the ships' accessibility to disabled persons."), *on reconsideration on other grounds*, 107 F. Supp. 2d 1135 (N.D. Cal. 2000).

Here, Dunn's allegations do not plausibly suggest that Brett/Robinson maintains any control over architectural barriers in the Complex, the alleged source of discrimination in Count One.   Similarly, Count Three is asserted as a claim for denial of the opportunity to equal participation, the alleged source of these discriminatory acts is the same as that in Count One – architectural barriers within the Complex.   (*See* Doc. 33 at 25 (alleging denial of opportunity "to participate equally in the rental program for the condominiums … because Defendants do not maintain any accessible condominiums and/or facilities at Phoenix West II")). Thus, the undersigned recommends that Brett/Robinson's motion to dismiss be **GRANTED** as to Counts 1 and 3.

### D.    Count Two

PW II and Brett/Robinson argue that Count 2, asserting discrimination under § 12182(b)(2)(A)(ii) for "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities," is due to be dismissed because Dunn does not allege that he actually requested a reasonable modification.   The Association adopts this argument.   (*See* Doc. 44 at 20 n.6).   In support, they cite *Larsen v. Carnival Corp., Inc.*, 242 F. Supp. 2d 1333 (S.D. Fla. 2003), in which the district court held that a Title III "plaintiff who alleges that a defendant failed to reasonably modify its policies, practices or procedures must show that he or she ***actually requested*** a modification that was necessary for full and equal enjoyment and that such a modification is reasonable in the run of cases."   242 F. Supp. 2d at 1342 (emphasis added) (citing *Johnson v. Gambrinus Co. / Spoetzl Brewery*, 116 F.3d 1052, 1058-60 (5th Cir. 1997) (for Title III reasonable modifications claims, "[t]he plaintiff has the burden of proving that a modification was requested and that the requested modification is reasonable…")).

In response, Dunn simply notes that this argument "is not dispositive" because it is premised on a "cited case from the 5th Circuit," and "[n]either the United States Supreme Court nor the 11th Circuit have held that the notice provisions of the ADA Title I for employment cases are applicable to Title III, ADA litigation…"   (Doc. 47 at 13).   While true that no binding authority on this point

exists in this Circuit,[12] Dunn makes no attempt to argue why the Fifth Circuit's holding in *Johnson* should not be accepted as persuasive authority, as other district courts have done.   *See, e.g.*, *Colo. Cross Disability Coal. v. Hermanson Family Ltd. P'ship I*, 264 F.3d 999, 1004 (10th Cir. 2001) (noting that "[s]everal district courts have adopted *Johnson*'s allocation of the burden of proof in subsection (ii) cases"); *Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1305 (S.D. Fla. 2013) (Rosenbaum, J.) ("[T]his Court finds the subsection (ii) framework established by *Johnson* to be instructive here…").   The undersigned does find the *Johnson* framework persuasive on this point and will apply it here.   As Dunn concedes that he did not actually request a modification from the Defendants, the undersigned recommends that the Defendants' motions to dismiss be **GRANTED** as to Count 2.[13]

---

[12] *See Alumni Cruises, LLC v. Carnival Corp.*, 987 F. Supp. 2d 1290, 1304 (S.D. Fla. 2013) (noting that "the Eleventh Circuit has not addressed the allocation of burdens of proof in cases involving subsection (ii) of Section 12182(b)(2)(A)").

[13]     "Assuming only for the purpose of this argument … that a request might be necessary," Dunn argues "a request for modification is not a prerequisite to maintaining an action for alleged discriminatory policies, practices, and procedures, if such a request would be futile."   (Doc. 47 at 13 (citing 42 U.S.C. § 12188(a)(1)). The full text of § 12188(a)(1)'s "futility" provision reads: "Nothing in this section shall require a person with a disability to engage in a futile gesture *if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its provisions*."   (emphasis added).   The Brett/Robinson employee's lone statement that the Complex did not provide ADA-compliant rooms does not constitute actual notice that the Defendants did not intent to make "reasonable modifications in policies, practices, or procedures" such that any request by Dunn for a modification would have been a futile gesture.
    Dunn is also incorrect that the holding in *Association of Disabled Americans v. Neptune Designs*, 469 F.3d 1357, 1359 (11th Cir. 2006) (per curiam), that "the ADA does not require pre-suit notice for claims filed against private public accommodations" overrides *Johnson*'s requirement of actually requesting a modification.   That holding addressed pre-suit notice of intent to file an ADA lawsuit.   *See Neptune Designs*, 469 F.3d at 1360 ("A person may file a suit seeking relief under the ADA without ever notifying the defendant of his intent to do so, and the district court may not dismiss the suit for lack of pre-suit

### E.    Count Four

Count 4 alleges that the Defendants "utilize the reservation system to screen out disabled individuals, so that they do not come to Phoenix West II.    The screening out process specifically involves directing disabled individuals away from Phoenix West II to a hotel alleged by the reservation system to be ADA compliant, but that in reality is not ADA compliant."    (Doc. 33 at 27, ¶ 66).    The undersigned agrees with PW II and Brett/Robinson, however, that Dunn has not plausibly alleged that the Complex's reservation system "screen[s] out or tend[s] to screen out an individual with a disability…"    42 U.S.C. § 12182(b)(2)(A)(i).

Though Dunn conclusorily asserts that the reservation system "direct[s] disabled individuals away from" the Complex, the factual allegations do not support this assertion.    Per the allegations in the First Amended Complaint, Dunn was able to contact the reservation desk at the Complex without any difficulty and successfully make a reservation.    There is no allegation that the Brett/Robinson employee Dunn spoke with suggested that he could not, or even should not, stay at the Complex because of his disability, and indeed Dunn actually did stay at the Complex without any resistance from the Defendants.    At most, Dunn was informed, upon inquiry, that the Complex did not provide ADA accessible rooms; there is no indication, however, that disabled individuals were hindered from staying at the Complex by the reservation system.    Dunn's allegations do not appear to assert the sort of "screening" criteria that Title III addresses.    *Cf. Rendon v. Valleycrest Prods., Ltd.*, 294 F.3d 1279 (11th Cir. 2002) (holding that plaintiffs

notice.").

had stated a valid Title III claim that the "fast finger" telephone selection process used for first round of eligibility to compete on "Who Wants to be a Millionaire" was a discriminatory screening mechanism, policy or procedure, that deprived the deaf and those with limited finger mobility of the opportunity to compete for the privilege of being a contestant).

Stripped of conclusory allegations claiming "screen out" by the reservation system itself, the gravamen of Count Four is the same as that for Counts One and Three – the Defendants' alleged failure to maintain an ADA-compliant facility by failing to remove or correct architectural barriers.   The undersigned is not convinced that the simple failure to remove architectural barriers, already prohibited under 42 U.S.C. § 12182(b)(2)(A)(iv)-(v), can, without more, simultaneously be classified as a prohibited "eligibly criterion" under § 12182(b)(2)(A)(i).   Accordingly, the undersigned recommends that PW II and Brett/Robinson's motions to dismiss be **GRANTED** as to Count 4.

The Association has not adopted this argument as to Count 4, instead simply arguing that it does not own or operate the reservation system.   As the undersigned noted previously, *see supra* n.10, this argument misses the point, as the relevant "public accommodation" the Association is alleged to operate is the Complex.   As such, the undersigned recommends that the Association's motion to dismiss be **DENIED** as to Count 4.

**F.     Dismissal of Claims Relating to Privately Owned Units in the Complex**

Finally, PW II and Brett/Robinson argue that Count 5 is due to be dismissed because the regulations on which this cause of action is premised do not apply to the

privately-owned condominiums that comprise Brett/Robinson's rental inventory. (*See* Doc. 39 at 19 – 21).   In a similar vein, the Association argues that "the ADA's alteration provisions do not apply to guest rooms that are privately owned.[14]   As such, to the extent Plaintiffs' Amended Complaint seeks to require alterations to individual units, the allegations fail as a matter of law."   (Doc. 44 at 22).

Dunn's Title III claims are asserted against the Complex as a whole.   Even if the individual condominium units may be exempt from ADA compliance, the Defendants have not addressed why ADA compliance would not at least apply to guest-accessible common areas in the Complex.   The present motions to dismiss are simply not the proper vehicles to parse exactly what portions of the Complex are subject to Title III and to what extent each Defendant may ensure ADA compliance at the Complex.   As the last section of *Roberts v. Royal Atl. Corp.* illustrates, *see* 542 F.3d at 378-79,[15] the question of who must do what to ensure ADA compliance

---

[14] There appears to be some truth in this assertion.   *See* 28 C.F.R. § 36.406(c)(2) ("Alterations to guest rooms in places of lodging where the guest rooms are not owned or substantially controlled by the entity that owns, leases, or operates the overall facility and the physical features of the guest room interiors are controlled by their individual owners are not required to comply with § 36.402 or the alterations requirements in section 224.1.1 of the 2010 Standards."); 28 C.F.R. § Pt. 36, App. A, § 36.406(c) ("The Department[ of Justice] has added an exception to § 36.406(c), providing that in existing facilities that meet the definition of places of lodging, where the guest rooms are not owned or substantially controlled by the entity that owns, leases, or operates the overall facility and the physical features of the guest room interiors are controlled by their individual owners, the units are not subject to the alterations requirement, even where the owner rents the unit out to the public through a transient lodging rental program. In addition, the Department has added an exception to the barrier removal requirements at [28 C.F.R. ]§ 36.304(g) providing that in existing facilities that meet the definition of places of lodging, where the guest rooms are not owned or substantially controlled by the entity that owns, leases, or operates the overall facility and the physical features of the guest room interiors are controlled by their individual owners, the units are not subject to the barrier removal requirement.").

[15]

  The plaintiffs in this case named as defendants the cooperative corporations,
  the managing authority, and some (but not all) unit owners, but they did not

---

can be a fact-intensive issue for entities with complicated ownership structures such as the Complex.    Thus, the undersigned recommends that the motions to dismiss be **DENIED** as to this basis.

## V.    Conclusion and Recommendations

In accordance with the foregoing analysis, it is **RECOMMENDED** as follows:

---

> identify particular units for modification or identify and serve process on the owners of those units.
>
> …
>
> We cannot say, … based on the existing record and factual findings, whether, in this case, the plaintiffs' claims for relief would fail based on the named defendants' potential inability to comply with orders of the district court directing modifications. Perhaps because the court concluded that no relief was available in the first place, it made no findings regarding the cooperative corporations' ability to solicit individual unit owners to volunteer their units for renovation on a distributed cost basis or with compensation, to purchase specific units as corporate property as they come onto the market, for corporate owners of second-floor units to swap with owners of first-floor units, or to buy first floor units when they come available, or for the unit owners to take any other action to cause the Resort to become ADA-compliant.
>
> If the district court, on remand, concludes that the plaintiffs are entitled to some or all of the relief they have sought, the court should, of course, inquire whether the named defendants can comply with an order to provide that relief. Perhaps the defendants may do so unilaterally; perhaps they may be able to solicit the assistance of individual unit owners…
>
> Only if the district court finds that the named defendants, having exhausted all options, are unable to comply with its orders would it need to consider whether the plaintiffs had failed to identify and serve necessary and indispensable parties (such as individual proprietary tenants) under Fed. R. Civ. P. 19.

*Roberts*, 542 F.3d at 378-79.

1. that PW II's Motion to Dismiss (Doc. 40) be **GRANTED** under Rule 12(b)(6) as to Dunn's claims in Counts 2 and 4 of the First Amended Complaint (Doc. 33), and otherwise **DENIED**;

2. that Brett/Robinson's Motion to Dismiss (Doc. 38) be **GRANTED** as to dismissal under Rule 12(b)(6) of Dunn's claims in Counts 1, 2, 3, and 4 of the First Amended Complaint (Doc. 33), and otherwise **DENIED**; and

3. that the Association's Motion to Dismiss (Doc. 43) be **GRANTED** as to dismissal under Rule 12(b)(6) of Dunn's claims in Count 2 of the First Amended Complaint (Doc. 33), and otherwise **DENIED**.

## VI.  <u>Notice of Right to File Objections</u>

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court.   *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P 72(b); S.D. Ala. GenLR 72(c).   The parties should note that under Eleventh Circuit Rule 3-1, "[a] party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions if the party was informed of the time period for objecting and the consequences on appeal for failing to object. In the absence of a proper objection, however, the court may review on appeal for plain error if necessary in the interests of justice."   11th Cir. R. 3-1.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

DONE this the 9th day of November 2015.

/s/ Katherine P. Nelson
**KATHERINE P. NELSON**
**UNITED STATES MAGISTRATE JUDGE**